UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:  JB AND COMPANY CHEVRON, LLC,                    No. 19-11504-j11

Debtor.

**<u>MEMORANDUM OPINION</u>**

Before the Court is a claim of New Mexico Taxation and Revenue Department

("NMTR") and an objection to the claim ("Objection to Claim" - Doc. 155) filed by Centinel

Bank of Taos ("Centinel Bank"). The Court held a final, evidentiary hearing on the Objection to

Claim on August 6, 2021 and took the matter under advisement. For the reasons explained

below, the Court will sustain the Objection to Claim.

FACTS[1]

JB and Company Chevron, LLC ("JB Chevron") filed a voluntary petition under chapter

11 of the Bankruptcy Code on June 24, 2019. On the same date, JB Chevron's principals, Johnny

Bautista Gonzales and Nancy Pauline Gonzales (together, the Gonzaleses) filed a voluntary

petition under chapter 13 of the Bankruptcy Code, as Case No. 19-11501-t13 (the "Gonzales

Chapter 13 Case").

JB Chevron scheduled NMTR as holding a claim in the amount of $130,000.00 secured

by a liquor license (the "Liquor License"). *See* Exhibit B. JB Chevron scheduled Centinel Bank

as holding a secured claim in the amount of $290,686.00, secured by the Liquor License and by

other collateral. *Id.* JB Chevron scheduled the Liquor License with a value of $400,000.00. *Id.*

---

[1] With the parties' consent, the Court took judicial notice of the docket and the documents filed in the JB
Chevron bankruptcy case and in Case 20-11769-t7 filed by Johnny Bautista Gonzales and Nancy
Pauline Gonzales. The Court sustained NMTR's objection to the Court taking judicial notice of the
docket and documents filed in the Gonzaleses' chapter 13 case, Case No. 19-11501-t13.

On January 1, 2020, the Court entered an Order Fixing Time for Filing Proofs of Claim and Interests ("Claims Bar Date Order"). *See* Exhibit E. The claims bar date for NMTR and other creditors was February 20, 2020 (the "Claims Bar Date").[2] JB Chevron gave notice of the Claims Bar Date to all creditors, including Centinel Bank and NMTR, on January 6, 2020. *See* Exhibit F.

Centinel Bank timely filed a proof of claim on January 17, 2020, asserting a claim of $310,445.51, secured by a lien on the Liquor License and other collateral. *See* Exhibit G. Attached to Centinel Bank's proof of claim is a UCC Financing Statement identifying the Liquor License as collateral securing the debt JB Chevron owed to Centinel Bank. *Id.* JB Chevron's debt to Centinel Bank is also secured by the following property owned by the Gonzaleses individually: 1) real property upon which JB Chevron operated a gas station and convenience store (the "Gas Station Property"); 2) the Gonzaleses' residence (the "Residence"); and 3) twelve acres of farmland in Questa, New Mexico (the "Farmland Property").

NMTR filed the following proofs of claim in the JB Chevron chapter 11 case:

(a)     NMTR timely filed a proof of claim on July 8, 2019, asserting a claim in the amount of $137,397.33 (the "Original Claim"). *See* Exhibit C. The Original Claim was based on past due tax liabilities arising from CRS-1 (gross receipts tax) returns, and estimated tax liabilities for periods in which there were non-filed CRS-1 returns and non-filed Combined Fuel Tax ("CFT") returns. *Id.* The Original Claim asserted (i) a secured claim in the amount of $117,794.59 for taxes, penalties, and interest due on timely filed and late filed CRS-1 returns, (ii) a priority unsecured claim in the amount of $18,767.40 based on estimated pro-rated average taxes on non-filed CRS-1 returns and estimated withholding taxes and interest based on

---

[2] For governmental units like NMTR, the Claims Bar Date Order fixed a bar date of the later of February 20, 2020 or 180 days after the petition date. The claims bar date applicable to NMTR was February 20, 2020 because February 20, 2020 is later than 180 days after the date JB Chevron filed its voluntary bankruptcy petition.

mismatched returns; and (ii) a non-priority unsecured claim in the amount of $835.34 for estimated penalties based on late-filed, non-filed, and "mismatched" CRS-1 and WC (worker's compensation) returns and penalties relating to non-filed CFT returns. *Id*. Attachments to the Original Claim reflect estimated taxes on a total of thirteen mismatched returns JB Chevron filed with NMTR and with the New Mexico Department of Workforce Solutions. *Id.*

(b)     NMTR timely amended its proof of claim on October 23, 2019 (the "Second Claim"), asserting a claim in the amount of $134,439.35. *See* Exhibit D. The secured, priority unsecured, and non-priority unsecured components of the Second Claim are the same as stated in the Original Claim except the priority unsecured claim is reduced from $18,767.40 to $15,809.42. *Id.* Like the Original Claim, the Second Claim is based on a combination of timely and late filed returns and estimated taxes for non-filed returns. *Id.* Like the Original Claim, the Second Claim reflects estimated taxes on a total of thirteen mismatched returns JB Chevron filed with NMTR and with the New Mexico Department of Workforce Solutions. *Id.*

(c)     On January 29, 2021, NMTR filed another amended proof of claim (the "Third Claim"), asserting a claim in the amount of $1,096,104.18. *See* Exhibit V. The Third Claim states that it amends the Second Claim. *Id.* The Third Claim asserts (i) a secured claim in the amount of $117,794.59 for taxes, penalties, and interest due on timely filed and late filed CRS-1 returns; (ii) a priority unsecured claim in the amount of $504,693.29 based on timely and late filed CRS-1 returns; estimated withholding taxes and interest based on mismatched returns filed for various periods in 2015, 2016, 2017 and 2018; NMTR gross receipts tax project assessments for mismatched CRS-1 returns for various periods in 2016, 2017 and 2018; and estimated taxes and interest for a mismatched WC-1 return for a period in 2017; and (iii) a non-priority unsecured claim in the amount of $473,616.30 for penalties and interest based on timely and late

filed CRS-1 returns, mismatched returns, and NMTR gross receipts taxes based on project assessments for various periods in 2014, 2015, 2016, 2017, 2018, and 2019. *Id.*

   (i) Attachments to the Third Claim show that the increase of NMTR's claim from $134,439.35 under the Second Claim to $1,096,104.18 under the Third Claim was attributable to NMTR tax assessments, called project assessments, following NMTR's audit of ten JB Chevron CRS-1 returns filed for 2014, 2015, 2016, 2017, and 2018 tax reporting periods. *Id.* NMTR performed the audits as a result of mismatches between CRS-1 returns JB Chevron filed with NMTR and Schedules C the Gonzaleses included in their individual federal income tax returns filed with the Internal Revenue Service ("IRS"). The project assessments increased the amount of gross receipts taxes NMTR had included in the Original Claim and Second Claim for the ten JB Chevron CRS-1 returns that were unaudited.

   (ii) The Third Claim includes the same amount of estimated taxes on the thirteen mismatched returns JB Chevron filed with NMTR and with the New Mexico Department of Workforce Solutions previously included in the Original Claim and the Second Claim. *Id.* The Third Claim also includes the same amount of estimated taxes based on non-filed CFT returns previously included in the Original Claim and the Second Claim. *Id.*

  (d) On August 5, 2021, NMTR filed another amended proof of claim (the "Fourth Claim"), asserting a claim of $886,220.84. *See* Exhibit 1. The Fourth Claim states that it amends the Third Claim. *Id.* The Fourth Claim asserted (i) a secured claim in the amount of $117,794.59, (ii) a priority unsecured claim in the amount of $503,150.08.29, and (ii) a non-priority unsecured claim in the amount of $265,276.17. *Id.* The Fourth Claim is substantially similar to the Third Claim, except the Fourth Claim eliminates NMTR's claim for two 2014 tax project assessments outside the applicable statute of limitations. Like the Third Claim, attachments to the Fourth

-4-

Claim reflect NMTR gross receipts tax project assessments for eight CRS-1 returns mismatched with IRS returns the Gonzaleses filed for periods in 2015, 2016, 2017 and 2018; estimated taxes on the thirteen mismatched returns JB Chevron filed with NMTR and with the New Mexico Department of Workforce Solutions previously included in the Original Claim and the Second Claim; and estimated taxes based on non-filed CFT returns previously included in the Original Claim and the Second Claim. *Id.*

*The Chapter 11 Plan*

JB Chevron filed Debtor's Liquidating Plan of Reorganization dated April 20, 2020 (the "Plan") and Disclosure Statement in Support of Debtor's Liquidating Plan (the "Disclosure Statement") on April 20, 2020. *See* Exhibits H and I. The Plan provided, in relevant part, that

(a)     NMTR is owed $117,794 plus interest on its secured claim, which would be paid in full from the proceeds of the sale of the Liquor License. *See* Exhibit H.

(b)     JB Chevron would pay Centinel Bank's claim, in part, from the proceeds of the sale of the Liquor License. *Id.*

(c)     Holders of allowed priority unsecured tax claims would be paid in full within 60 months after the petition date. *Id.*

NMTR objected to JB Chevron's Plan and Disclosure Statement, asserting that JB Chevron had not submitted required CFT (combined fuel tax ) reports from December 2014 through the petition date and had not resolved discrepancies in its employer withholding tax reports submitted to NMTR and to the New Mexico Department of Workforce Solutions. *See* Exhibit L. NMTR asserted further that payment of all tax liability due to NMTR is a condition precedent to NMTR issuing a tax clearance certificate required by the Liquor Control Act, NMSA 1978, § 60-3A-1, *et. seq.* for the transfer of the Liquor License. *Id.*

-5-

Centinel Bank also filed an objection to the Plan, stating, in part, that it would not oppose confirmation of an amended plan that incorporated the terms of an agreement with JB Chevron and the Gonzaleses regarding termination of the automatic stay. *See* Exhibit M.

The Court confirmed the Plan by entering a Stipulated Order Confirming Plan of Reorganization on June 3, 2020. *See* Stipulated Order Confirming Plan of Reorganization ("Confirmation Order" – Exhibit P). NMTR, Centinel Bank, and JB Chevron, by their respective counsel, all approved the Confirmation Order. *Id.* The Confirmation Order provides that "[T]he Debtor shall provide all tax reporting required by [NMTR]. [NMTR] shall be under no obligation to provide a tax clearance or release its claims against the Liquor License unless and until its claim is paid in full from the proceeds of the sale of the Liquor License." *Id.*

Neither NMTR's Third Claim nor its Fourth Claim, filed well after NMTR filed its objection to the Plan, increased the amount of NMTR's claim under the Original and Second Claim for combined fuel taxes (CFT) or withholding taxes. *See* Exhibits C, D, and V and Exhibit 1.

*The Gonzaleses' Bankruptcy Cases*

While the Gonzales Chapter 13 Case was pending, Centinel Bank, JB Chevron and the Gonzaleses reached an agreement for termination of the automatic stay (the "Stay Agreement"), which contemplated the sale of the Liquor License, with the net proceeds to be paid to Centinel Bank after payment of NMTR's allowed secured claim; Centinel Bank not opposing a lease to a third party of the Gas Station Property, with purchase option; sale of the Farmland Property with the net proceeds to be paid to Centinel Bank; and the stay remining in place on the Residence pending further order of the Court, unless there was a default under the Stay Agreement. *See* Exhibit J. Centinel Bank entered into the Stay Agreement in part because it anticipated receiving

a portion of the proceeds from the sale of the Liquor License. The Stay Agreement was approved in JB Chevron's bankruptcy case and in the Gonzales Chapter 13 Case. *See* Exhibits N and O. The Gonzales Chapter 13 Case was dismissed by stipulation on July 20, 2020. *See* Exhibit X.

Following dismissal of the Gonzales Chapter 13 Case, the Gonzaleses filed a voluntary petition under chapter 7 of the Bankruptcy Code as Case No. 7-20-11769-TS (the "Gonzales Chapter 7 Case"). *See* Exhibit Y. In November 2020, in connection with the Gonzales Chapter 7 case, Centinel Bank, the Gonzaleses, and the Chapter 7 Trustee reached an agreement for termination of the automatic stay, abandonment of property, and a carve-out (the "Stay/Carve-Out Agreement"). *See* Exhibits AA and BB. The Stay/Carve-Out Agreement included a provision for the sale of the Farmland Property with a carve-out from Centinel Bank's lien against the property for the benefit of the bankruptcy estate. *Id.* The Court entered an order approving the Stay/Carve-Out Agreement on December 10, 2020. *See* Exhibit BB. The carve-out provision provided a 50-50 split of the net proceeds from the sale of the Farmland Property between Centinel Bank and the chapter 7 bankruptcy estate. *See* Exhibit AA. Centinel Bank agreed to the carve-out provision in part because it anticipated receiving proceeds from the sale of the Liquor License. By an order entered May 20, 2021, the Court approved the sale of the Farmland for $50,000, with the net sale proceeds to be split evenly between Centinel Bank and the bankruptcy estate pursuant to the Stay/Carve-Out Agreement. *See* Exhibit DD. Centinel Bank received $22,177.50 from the net proceeds of the sale of the Farmland Property. *See* Exhibit EE.

*The Sale of the Liquor License*

On September 24, 2020, JB Chevron filed a motion to approve the sale of the Liquor License. *See* Motion for Order Approving Sale of Dispenser's License 799 Free and Clear of Liens and Use of Sales Proceeds to Pay Claims ("Motion to Approve Sale of Liquor License" –

Exhibit Q). The Motion to Approve Sale of Liquor License stated that NMTR has a lien against the Liquor License for unpaid gross receipts tax in the approximate amount of $137,000, that Centinel Bank has a junior lien against the Liquor License in the approximate amount of $310,445.51, and that the anticipated sale of the Liquor License would pay NMTR's claim in full and would pay a significant portion Centinel Bank's claim. *Id.* NMTR did not object to the Motion to Approve Sale of Liquor License. The Court granted the Motion to Approve Sale of Liquor License on October 23, 2020. *See* Default Order Approving Sale Free and Clear of Liens (the "Sale Order" – Exhibit R). The Sale Order authorized the sale of the Liquor License on the terms set forth in the Motion to Approve Sale of Liquor License, and provided that the sale proceeds may immediately be used to pay the costs of sale, the amount due to NMTR, and any amounts due to beverage suppliers, with the remaining sale proceeds to be paid to Centinel Bank. *Id.*

Despite the entry of the Sale Order, NMTR refused to permit the closing of the sale of the Liquor License. On January 22, 2021, JB Chevron filed a motion to enforce the Sale Order and requested an emergency hearing on its motion. *See* Exhibits S and T. On January 29, 2021, a stipulated order was entered requiring NMTR to issue a letter of clearance allowing the sale of the Liquor License. *See* Stipulated Order Setting out Sales Procedure – Exhibit U. Pursuant to the Stipulated Order Setting out Sales Procedure, NMTR received $147,211.09 from the proceeds of the sale of the Liquor License, based on the Second Claim in the amount of $134,439.35 plus interest from the petition date. *Id.* The remaining sale proceeds in the amount of $152,127.23, after payment of the broker's sales commission, a renewal fee, and a liquor distributor's claim, are being held by JB Chevron's counsel in his attorney trust account pending further order of the Court. *Id.*

-8-

*NMTR's Audit of JB Chevron's Tax Returns Resulting in NMTR's Late-Filed Proofs of Claim*

NMTR reviews information reported in taxpayers' federal income tax returns to ensure that the amounts reported on federal tax returns match the amounts reported on state tax returns. For limited liability companies, NMTR compares the income reported on Schedule C of the federal tax returns filed by the members of the limited liability company with the income or revenue reported on the limited liability company's tax returns filed with NMTR. NMTR receives magnetic media from the IRS that NMTR uses to conduct audits. If amounts reported on returns filed with the IRS do not match with amounts reported on returns filed with NMTR, NMTR calls it a "mismatch." An audit resulting from a mismatch can result in NMTR assessing additional taxes, known as project assessments.

Centinel Bank received copies of the Gonzaleses' individual federal tax returns for tax years 2014 through 2018 in July of 2019, about seven months before the Claims Bar Date. This is the only information before the Court regarding when the Gonzaleses' individual federal tax returns for those years were filed with the IRS. In September 2020, NMTR began an audit of JB Chevron's CRS-1 tax reports for 2014 through 2018 after NMTR "management" provided Sylvia Sena, tax audit supervisor for NMTR, with IRS magnetic data for 2014 through 2018 federal tax returns the Gonzaleses filed with the IRS. NMTR began its audit because of a mismatch between amounts the Gonzaleses reported to the IRS on their individual federal tax returns with amounts JR Chevron reported on CRS-1 reports filed with NMTR. Ms. Sena did not know when the Gonzaleses filed their 2014-2018 individual federal tax returns, when the IRS transmitted the magnetic data from those tax returns to NMTR, or when NMTR received that information from the IRS. There is no evidence before the Court regarding when the IRS transmitted the magnetic data from the Gonzaleses' individual federal tax returns to NMTR, whether NMTR could have

-9-

received that information from the IRS earlier had it requested it, or the date NMTR received that information from the IRS.

The only evidence before the Court regarding the timing of NMTR's audit in relation to when MMTR learned of the mismatches is that it conducted the audit in the ordinary course of its business and that it began its audit sometime in September 2020. NMTR had notice of JB Chevron's chapter 11 bankruptcy case and the Claims Bar Date fixed at February 20, 2020. Yet, there is no evidence before the Court that NMTR made any effort to expedite the transmission of any information it received from the IRS to NMTR's audit department.

The audit of JB Chevron's tax returns against Schedule C of the Gonzaleses' individual federal tax returns[3] revealed underreporting of amounts due for gross receipts taxes owed to NMTR for tax years 2014 through 2018. NMTR mailed a letter to JB Chevron on November 16, 2020 notifying JB Chevron of the mismatches and its notice of intent of assessment of additional tax due. JB Chevron did not respond. Lisa Ela, tax examiner for NMTR, learned in late December of 2020 that NMTR's auditor had completed the project assessment resulting in significant additional taxes due. She received the figures from the audit in January of 2021 and prepared the Third Claim filed on January 29, 2021, increasing NMTR's claim from $134,439.35 plus post-petition interest to $1,096,104.18. *See* Exhibit V. On the same day, NMTR mailed JB Chevron a notice of assessment. The Third Claim was filed more than 11 months after expiration of the Claims Bar Date and about eight months after confirmation of JB Chevron's Plan.

The Fourth Claim filed August 5, 2021 reduced NMTR's claim from $1,096,104.18 to $866,220.84 because the Third Claim included assessments for tax year 2014 outside the statute of limitations. *See* Exhibit 1.

---

[3] Because JB Chevron is a limited liability company, and the Gonzaleses are its sole members, income from JB Chevron appears on Schedule C of the Gonzaleses' individual tax returns.

## DISCUSSION

Centinel Bank's Objection to Claim objects to the Third Claim. Upon the stipulation of the parties, the Objection to Claim is deemed an objection to the Fourth Claim filed the day before the evidentiary hearing. However, the Court's analysis is based on the facts and circumstances surrounding the filing of the Third Claim since the Fourth Claim is identical to the Third Claim except for the elimination of tax assessments outside the statute of limitations.[4]

NMTR filed the Third Claim nearly year after the Claims Bar Date and more than seven months after confirmation of JB Chevron's Plan. Centinel Bank contends that the Third Claim is really an untimely filed new claim, and that, even if it is not a new claim, NMTR cannot amend its timely filed Second Claim at this late date. NMTR counters that the amendment is necessary to make the claim accurate, and that JB Chevron's submission of incomplete or incorrect returns to NMTR caused the problem.

Different standards apply to whether to permit an amendment to a timely filed claim after the claims bar date and whether to permit the filing of a new claim after the bar date. *See infra*. Therefore, in determining whether the Fourth Claim is time barred, the Court must first determine whether the Third and Fourth Claims are amendments of the Second Claim or are in fact new claims. "The court should not allow truly new claims to proceed under the guise of amendment." *Unioil v. Elledge (In re Unioil, Inc.)*, 962 F.2d 988, 992 (10th Cir. 1992). *See also In re Hemingway Transp., Inc.*, 954 F.2d 1, 10 (1st Cir. 1992) ("[T]he proposed amendment must not be a veiled attempt to assert a distinctly new right to payment as to which the debtor estate was not fairly alerted by the original proof of claim.").

---

[4] The Third Claim and the Fourth Claim were both filed after the Claims Bar Date. If the Third Claim is allowed as an amended claim, the Fourth Claim would likewise be allowed because it merely reduces the amount of NMTR's claim. If the amendment reflected in the Third Claim is disallowed, the same reasoning would apply to the Fourth Claim.

-11-

A less demanding standard applies to amending timely filed claims than to filing new claims after the claims bar date. Ordinarily, courts should freely permit amendment of a timely filed proof of claim "so long as the claim initially provided adequate notice of the existence, nature, and amount of the claim as well as the creditor's intent to hold the estate liable." *Unioil*, 962 F.2d at 992. *See also In re Tanaka Brothers Farms, Inc.*, 36 F.3d 996, 998 (10th Cir. 1994) ("A creditor's '[l]ate-filed amendments to proofs of claim should be treated with liberality' . . . . ") (quoting *Unioil*, 962 F.2d at 992). On the other hand, if the amended claim is really a new claim, the claimant must satisfy the stringent excusable neglect standard under Fed.R.Bankr.P. 9006(b)(1) and *Pioneer Inv. Services Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) to file an untimely new claim. *See In re Las Uvas Valley Dairies*, 620 B.R. 367, 374 (Bankr. D.N.M. 2020) (applying Fed.R.Bankr.P. 9006(b)(1) and *Pioneer* after determining that the creditor's amended claim was a really a new claim); *see also In re Enron Corp.*, 419 F.3d 115, 133-34 (2d Cir. 2005) (the difference between the analysis applicable to an amended claim filed after the claims bar date and the analysis of a tardily filed new claim is: "While belated *amendments* will ordinarily be 'freely allowed' where other parties will not be prejudiced, belated *new* claims will ordinarily be denied, even absent prejudice, unless the reason for the [creditor's] delay is compelling.").[5]

A claim is amendable "where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim." *LeaseAmerica Corp. v. Eckel*, 710 F.2d 1470, 1473 (10th Cir. 1983) (quoting *Matter of Commonwealth Corp.*, 617 F.2d 415, 420 (5th Cir. 1980)). *See also*

---

[5] NMTR did not argue that the Third Claim or the Fourth Claim should be allowed as an untimely filed new claim based on NMTR's excusable neglect. Nor does the evidence support a finding that NMTR's delay in filing the Third Claim or the Fourth Claim after the Claims Bar Date was due to excusable neglect.

-12-

*United States v. Int'l Horizons, Inc. (In re Int'l Horizons, Inc.)*, 751 F.2d 1213, 1216 (11th Cir. 1985) (same); *Hemingway Transp.*, 954 F.2d at 10 ("Amendments to proofs of claim timely filed are to be freely allowed, whether for purposes of particularizing the amount due under a previously-asserted right to payment, or simply to cure technical defects in the original proof of claim."). An allowed amended claim relates back to the date of the filing of the original proof of claim. *Hemingway,* 954 F.2d at 10.

Centinel Bank contends that the Third Claim and therefore also the Fourth Claim are new claims filed after the Claims Bar Date. To determine the standard applicable to whether to allow the filing of the Third and Fourth Claims, the Court must determine whether the Third Claim, and therefore also the Fourth Claim, is an amendment to the Second Claim or is a new claim filed in the guise of an amendment.

Centinel Bank contends that the Third Claim is really a new claim because it is based on different taxes than those claimed in the Second Claim. Centinel Bank points out that NMTR's objection to confirmation focused on CFT (fuel) taxes and mismatched amounts as reported to the New Mexico Department of Workforce Solutions, not gross receipts taxes, and that NMTR failed to allege that any "project assessments" existed prior to filing the Third Claim. This Court disagrees that the Third Claim is a really new claim because it is based on a different type of tax or different tax reporting periods. Both the Second Claim and the Third Claim are based in part on gross receipts taxes arising from tax reporting periods in 2014 through 2018. Under the Second Claim, NMTR claimed unpaid gross receipts taxes as reported in CRS-1 reports JB Chevron filed in each of those periods. The increase in the amount of the Third Claim results from (i) NMTR auditing CRS-1 reports included in the Second Claim after discovering mismatches between those reports and tax returns filed with the IRS for the same tax years, and

-13-

(ii) NMTR assessing additional gross receipts taxes based on the audit results. The decrease in the amount of the Fourth Claim results from NMTR eliminating from its claim taxes assessed for 2014 reporting periods as outside the applicable statute of limitations. The Original Claim and the Second Claim thus gave adequate notice of the existence and nature of NMTR's claim for unpaid gross receipts taxes.

Centinel Bank contends further that the Third Claim and Fourth Claim are new claims because of the significant increase in the amount NMTR has claimed after the Claims Bar Date. That raises the issue of whether the significant increase in the amount of the claim alone is sufficient to conclude that the Third Claim is really a new claim in the guise of an amendment. The approximate $965,000 increase in the amount of the Third Claim compared with the Second Claim is more than 8 times as much as the Second Claim. The approximate $750,000 increase in the amount of the Fourth Claim compared with the Second Claim is more than 6.5 times as much as the Second Claim.

In *Tanaka Brothers*, the Tenth Circuit considered whether an amended claim filed by the IRS in the amount of $471,142.48 after the claims bar date was in fact an amendment to the original claim filed as an estimated claim in the amount of $115,000 or was a new claim filed in the guise of an amended claim. 36 F.3d at 998. The claim filed after the claims bar date was about 4 times the amount of the original timely filed claim. The original claim was filed as an estimated claim because the debtor had not filed tax returns for the period in question. The Tenth Circuit concluded that the claim filed after the bar date was in fact an amended claim, not a new claim filed in the guise of an amended claim, and that the bankruptcy court abused its discretion in disallowing the IRS's amended claim. *Id.* at 1000.

To determine both whether the amended claim in fact was an amendment and not a new claim in the guise of an amended claim, and, if an amended claim, whether the IRS should be permitted to amend its claim, the *Tanaka* Court identified and applied the following factors:[6]

> (1) Whether the parties or creditors relied on the . . . initial claim, or whether they had reason to know subsequent proofs of claim would follow pending the completion of the audit;
>
> (2) Whether other creditors would receive a windfall to which they are not entitled on the merits by the Court not allowing this amendment to the . . . proof of claim;
>
> (3) Whether the . . . [creditor] intentionally or negligently delayed in filing its amended claim;
>
> (4) The justification, if any, for the failure to request the timely extension of the bar date;
>
> (5) Any other general equitable considerations.

*Tanaka Brothers*, 36 F.3d at 998-99 (quoting *In re Oasis Petroleum Corp.,* 130 B.R. 89, 92 (Bankr. C.D. Cal. 1991)).[7]

---

[6] Unlike the Tenth Circuit in *Tanaka Brothers*, many courts considering whether to allow a claim filed as an amended claim filed after the claims bar date first examine whether the claim is an amended claim or a new claim before applying the applicable standard. *See, e.g., In re Enron Corp*,. 419 F.3d 115, 133 (2nd Cir. 2005) (examining first whether the amended claim in fact amends a timely filed claim or whether it is a new claim filed in the guise of an amended claim; and second, applying the applicable standard for determining whether to permit the amendment or the filing of a new claim); *Hemingway Transp.,* 954 at 10 ("First, the proposed amendment must not be a veiled attempt to assert a distinctly new right to payment as to which the debtor estate was not fairly alerted by the original proof of claim . . . . Second, the amendment must not result in unfair prejudice to other holders of unsecured claims against the estate . . . . Third, the need to amend must not be the product of bad faith or dilatory tactics on the part of the claimant.") (citations omitted). This Court will follow the unitary approach taken in *Tanaka Brothers,* which is binding precedent on this Court, as did the bankruptcy court in *Las Uvas*, 620 B.R. at 374-75 (applying the *Tanaka Brothers* factors to determine whether an amendment to a timely filed proof of claim was really a new claim). However, this Court would reach the same result under the unitary approach or under approaches taken by other courts. As noted by the Bankruptcy Court for the District of Kansas, whether to allow the amendment of a timely filed proof of claim "really come[s] down to two questions. First, is the creditor attempting to stray beyond the perimeters of its original proof of claim, effectively filing a new claim, and [second] what is the degree and incidence of prejudice caused by the creditor's delay." *In re Coover*, No. 06-40176, 2006 WL 4491439, at *5 (Bankr. D. Kan. Sept. 28, 2006).

[7] In many cases it is not necessary to apply these factors where it is obvious whether a claim filed after the claims bar date is an amendment of a previously filed claim, such as when an amended claim corrects a technical defect in the original claim or attaches supporting documentation, or is a new claim, such as a claim based on occurrences and transactions wholly unrelated to the original claim.

-15-

Other factors relevant to whether to allow a claim to be amended include:

(6) Whether the creditor designated the original claim as an estimate;[8]

(7) The relative size of the proposed increase in the amount of the claim;[9]

(8) Whether the debtor's plan has already been confirmed;[10] and

(9) Whether a party will be unduly prejudiced by allowance of the amended claim.[11]

Of all these factors, often the factor given the most weight is whether the party opposing the amendment will suffer actual prejudice by the amendment. *Enron*, 419 F.3d at 133 ("The critical consideration is whether the opposing party will be unduly prejudiced by the amendment.") (quoting *In re Integrated Res., Inc.*, 157 B.R. 66, 70 (D.S.D.N.Y. 1993)). Whether to allow an amendment falls within the Court's sound discretion. *Hemingway Transp.*, 954 F.2d at 10 ("The equitable determination to allow or disallow an amendment to a proof of claim timely filed is entrusted to the sound discretion of the bankruptcy court.").[12] If the party opposing the amendment to a proof of claim cannot demonstrate actual prejudice, generally it is within the court's discretion to allow the amendment. *See Unioil*, 962 F.2d at 993 (where the opposing

---

[8] *See Tanaka Brothers.*, 36 F.3d at 1000 (the fact that the IRS's proof of claim was clearly designated as an estimate was critical to the court's conclusion that the amended claim should be allowed); *Las Uvas*, 620 B.R. at 373.

[9] *See In re Stavriotis*, 977 F.2d 1202 (7th Cir. 1992) (denying IRS leave to amend its claim to increase the amount from $11,132.93 to $2,435,078.39, more than 220 times the original claim); *Las Uvas*, 620 B.R. at 373.

[10] *See In re New River Shipyard, Inc.*, 355 B.R. 894, 909 (Bankr. S.D. Fla. 2006) ("[P]ost-confirmation amendment of a claim should only be allowed for compelling reasons.") (citing *In re Chappell*, 984 F.2d 775 (7th Cir. 1993)); *Las Uvas*, 620 B.R. at 373.

[11] *Enron,* 419 F.3d at 133; *Coover*, 2006 WL 4491439, at *5 (whether to allow an amendment depends on "the degree and incidence of prejudice caused by the creditor's delay." ).

[12] *See also In re Commercial Club Ltd.*, 978 F.2d 1267 (10th Cir. 1992) (unpublished) ("[T]he decision whether or not to allow an amendment to an amendable proof of claim is reviewed solely for an abuse of the bankruptcy court's discretion.") (citing *Unioil*, 962 F.2d at 992); *In re In re Richter*, 478 B.R. 30, 39 (Bankr. D. Colo. 2012) (whether to allow an amendment to a timely filed proof of claim falls within the court's discretion).

party did not demonstrate actual prejudice resulting from the amendment, it was within the court's discretion to allow the amended claim).

Applying these factors to the Third Claim, the Court concludes the size of the increase in the amount of NMTR' claim by itself is insufficient to establish that the Third Claim is really a "new" claim, although the factors weigh strongly in favor of disallowing amendment of the Second Claim as untimely. The Court will address the relevant factors.

*Prejudice to Centinel Bank and Reliance on the Original Claim*

Centinel Bank relied on the nature and amount of NMTR's claim as stated in the Second Claim when deciding to support JB Chevron's Plan. The Plan provided for sale of the Liquor License and payment of NMTR's secured claim in full, with the remaining proceeds to be paid to Centinel Bank. NMTR objected to the Plan on the ground that JB Chevron had not submitted required CFT (combined fuel tax) reports and had not resolved discrepancies in its employer withholding tax reports submitted to NMTR and to the New Mexico Department of Workforce Solutions. The confirmation order required JB Chevron to provide NMTR with all tax reporting that NMTR required and provided that NMTR would be under no obligation to provide a tax clearance needed for the sale of the Liquor License unless its claim is paid in full from the sale proceeds. Neither NMTR's Third Claim nor its Fourth Claim increased the amount of NMTR's claim under the Original and Second Claim for CFT or withholding taxes.

In addition, Centinel Bank relied on the nature and amount of NMTR's claim as stated in the Second Claim and in the Sale Order when it entered into the Stay/Carve-Out Agreement. The Sale Order authorizing the sale of the Liquor License, entered October 23, 2020, and the Motion to Approve Sale of Liquor License contemplated payment of NMTR's claim in full from the sale of the Liquor License, based on the Second Claim in the amount of $134,439.35 plus interest

-17-

from the petition date, with a substantial amount remaining to pay Centinel Bank's secured claim.

Although NMTR commenced its audit of JB Chevron's gross receipts tax reports in September 2020 based on mismatches between tax reporting to NMTR and to the IRS, NMTR did not object to the Motion to Approve Sale of Liquor License, did not disclose the ongoing audit to Centinel Bank, and did not alert JB Chevron and other creditors that the audit might result in NMTR seeking to increase substantially the amount of its Second Claim. This left Centinel Bank confident that the sale of the Liquor License would result in sufficient proceeds to pay both NMTR's claim and pay a good portion of Centinel Bank's secured claim. In November 2020, Centinel Bank agreed to the carve out from the proceeds from the sale of the Farmland Property to benefit the Gonzaleses' chapter 7 bankruptcy estate in reliance on the Sale Order, the Second Claim and the confirmed Plan, expecting to receive the remaining proceeds from the sale of the Liquor License after payment of the Second Claim. The Court approved the carve-out on December 10, 2020. *See* Exhibit BB. NMTR did not file its Third Claim until well after the entry of the order approving the Stay/Carve-Out Agreement.

If the Third Claim were allowed, Centinel Bank would be prejudiced because the entire remaining balance from the sale of the Liquor License would be paid to NMTR in partial payment of its greatly increased priority claim. Centinel Bank gave up a portion of its collateral under the Stay/Carve-Out Agreement in reliance on the Second Claim and the Sale Order. Its expectation of payment on its secured claim under the terms of the confirmed Plan and the Sale Order would be lost if NMTR were allowed to amend its Second Claim.

-18-

*Windfall if the Amendment of the Second Claim is Disallowed*

Centinel Bank will not receive a windfall if the amendment to the Second Claim is disallowed. Centinel Bank's debt was secured by the Liquor License, the Gas Station Property, the Farmland Property, and the Residence. It realized only half of the proceeds from the sale of the Farmland Property because it agreed to forego the remaining half for the benefit of the Gonzaleses' chapter 7 bankruptcy estate in reliance on the Second Claim and its expectation of receiving payment from the sale of the Liquor License. The Plan and the Sale Order provided for Centinel Bank to receive some of the proceeds from the sale of the Liquor License after NMTR's claim as asserted at the time was paid in full, with interest. Disallowance NMTR's amendment to its Second Claim will not result in a larger distribution to similarly situated creditors as a whole; rather disallowance of the amendment to the Second Claim will result in Centinel Bank receiving the remaining proceeds from the sale of the Liquor License as contemplated under JB Chevron's confirmed Plan and the Motion to Approve Sale of Liquor License as granted by the Sale Order.

*The Length of NMTR's Delay in filing the Third Claim/Reasons for the Delay/Justification for Failing to Seek an Extension of the Bar Date*

NMTR never sought an extension of the Claims Bar Date. It filed its Third Claim on the same day the Court entered the order requiring NMTR to issue its tax clearance certificate so that the sale of the Liquor License could close, nearly a year after the Claims Bar Date. NMTR points out that JB Chevron's underreporting caused the problem and asserts that it did not likely obtain the Gonzaleses' personal income tax returns from the IRS until sometime in the summer of 2020, although there is no evidence regarding when NMTR received those returns. Once NMTR began its audit based on the information received from the IRS, it acted diligently to complete the audit, issue the project assessments, and amend its proof of claim. However, NMTR knew that it had commenced its audit by the time JB Chevron filed the Motion to Approve Sale of Liquor License

-19-

on September 24, 2020. NMTR could have responded to the Motion to Approve Sale of Liquor License to alert JB Chevron and Centinel Bank that it had commenced an audit which might result in additional tax due but failed to do so. Instead, NMTR did not object to the Motion to Approve Sale of Liquor License and the Sale Order authorizing the sale of the Liquor License was entered by default.

In addition, the timely filed Original Claim notes thirteen mismatched amounts relating to income amounts reported to the New Mexico Department of Workforce Solutions. NMTR thus had reason to know that JB Chevron might have other tax reporting discrepancies requiring further investigation. The Gonzaleses' federal tax returns at issue were filed long before the February 20, 2020 Claims Bar Date. Centinel Bank obtained a copy of the Gonzaleses' federal tax returns from prior tax years in July 2019. NMTR likewise may have received the returns or the magnetic media relating to the returns in that time frame, or if not, could have requested the Gonzaleses' federal tax returns and conducted its audit prior to the Claims Bar Date. It did not. NMTR instead followed its ordinary course of business and initiated its audit some indeterminate time after it received the magnetic information from the IRS. There is no evidence of the date NMTR actually received the magnetic information from the IRS. It is possible that NMTR had the mismatched information from the IRS well prior to the Claims Bar Date. NMTR took no special steps to expedite its review process after it learned of the other mismatched amounts. NMTR provided insufficient justification for its delay in filing the Third Claim and for failing to seek an extension of the Claims Bar Date prior to its expiration. Thus, NMTR has not met its burden of showing that it acted diligently in filing the Third Claim.

*Designation of the Original Claim as an Estimated Claim*

NMTR did not designate all or a portion of the Original Claim or the Second Claim as a mere estimate, though the attachments to the Original Claim and the Second Claim reflect that some of the amounts for CRS-1 taxes are based on "mismatched WH [withholding], estim per DWS [Department of Workforce Solutions]." *See* Exhibits C and D. Further, in objecting to the Plan, NMTR asserted that there may be additional taxes due. *See* Exhibit L. There is no evidence that those returns could not have been audited before the Claims Bar Date. Further, despite taking that position in objecting to the Plan, NMTR never audited the mismatched withholding tax returns reflected in attachments to the Original Claim and the Second Claim. Instead, it audited different gross receipts tax returns based on mismatches with IRS returns. Moreover, NMTR did not object to the Motion to Approve Sale of Liquor License, filed in September of 2020, around the time that NMTR likely began its audit. The Motion to Approve Sale of Liquor License contemplated payment to NMTR in the amount of its Second Claim, plus accrued interest.

*Size of the Increased Claim Amount*

The sheer size of the increased claim amount also weighs in favor of disallowance of the amendment,[13] though by itself, the increase in the claim amount is insufficient under the facts of this case to render the Third Claim a new claim. *See Hemingway Transp.,* 954 F.2d at 10 ("[A]s a general rule, amendments intended merely to *increase* the amount of a claim grounded in the same *right to payment*, are not considered 'new' claims under the Code."); *In re Callery*, 274 B.R. 51, 56 (Bankr. D.Mass. 2002) (IRS's amended proof of claim asserting significantly

---

[13] *See PT-1 Commc'ns, Inc.*, 292 B.R. 482, (Bankr. E.D.N.Y. 2003) ("[C]ourts have . . . ruled that a proof of claim which purports to amend a timely filed claim should be reasonably within the amount of the timely filed claim.") (citations omitted).

increased income tax obligations following the results of its investigation was not a "new" claim because all the asserted taxes derived from the same right to payment). NMTR's total claim increased from $137,397.33 in its Original Claim to $866,220.84 in its Third Claim, an increase of over 600%. If the Third Claim is allowed, NMTR will receive all of the remaining proceeds from the sale of the Liquor License, contrary to what was contemplated by the confirmed Plan and the Sale Order authorizing the sale of the Liquor License, depriving Centinel Bank of its expected payment on its secured claim.

*Post-Confirmation Amendment*

NMTR filed its Third Claim after confirmation of the Plan. Post-confirmation amendments to proofs of claim generally are disfavored. *See IRT Partners, L.P. v. Winn-Dixie Stores, Inc. (In re Winn-Dixie Stores, Inc.)*, 639 F.3d 1053, 1056-57 (11th Cir. 2011) (A "post-confirmation amendment—while not prohibited—is not favored . . . ."); *Las Uvas*, 620 B.R. at 373 n.6 ("[P]ost-confirmation claim amendments should rarely be allowed."); *In re Shealy*, 599 B.R. 397, 404 (Bankr. M.D. Ga. 2019) ("Although creditors have broad rights to amend their claims, that right narrows considerably once a plan is confirmed."). This is because a confirmed plan generally has preclusive effect, binding the debtor and all creditors to its terms. *Jaurdon v. Cricket Commc'ns, Inc.*, 412 F.3d 1156, 1158 (10th Cir. 2005) (creditor that received proper notice is bound by the terms of a confirmed plan); *Winn-Dixie*, 639 F.3d at 1056 (explaining that, similar to a civil judgment, confirmation extinguishes the claim and creates a new claim defined by the treatment under the plan, and determining that the confirmed plan had *res judicata* effect precluding the post-confirmation amendment of a creditor's proof of claim); *Las Uvas*, 620 B.R. at 373 n.6 ("This is because '[c]onfirmation of a chapter 11 plan is the equivalent of a final judgment in ordinary civil litigation' and is entitled to res judicata effect.") (quoting *New River*

*Shipyard,* 355 B.R. at 912). "[O]nly the most compelling circumstances justify" a post-confirmation amendment. *Winn-Dixie*, 639 F.3d at 1057. No compelling circumstances exist here.

### Other Equitable Considerations

It is unfortunate that NMTR did not complete its audit prior to the Claims Bar Date or in time to seek an extension of the Claims Bar Date prior to its expiration. But once NMTR becomes aware that a taxpayer has filed bankruptcy, NMTR should take appropriate steps to protect its interest and timely file a proof of claim. If, prior to the claims bar date, NMTR has mismatch information from the New Mexico Department of Workforce Solutions or the IRS, or reasonably could obtain such information but requires additional time to investigate or audit returns, NMTR should seek an extension of the claims bar date prior to its expiration to ensure creditors do not detrimentally rely on NMTR's timely filed claim. On the other hand, if NMTR discovers potential problems with filed tax returns possibility necessitating an audit after the claims bar date, it should seek leave to amend its claim as soon as it discovers the potential problems. Here, NMTR did neither, and a creditor reasonably relied on NMTR's timely filed Original Claim and Second Claim and would be unfairly prejudiced if NMTR were permitted to amend its claim further at this late date.

Based on the foregoing, the Court will sustain the Objection to Claim, disallow amendment of the Second Claim in the form of NMTR's Fourth Claim, and authorize the release of the remaining proceeds from the sale of the Liquor License to Centinel Bank.

The Court will enter a separate order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: August 31, 2021

COPY TO:

James A Askew
Attorney for Centinel Bank of Taos
Askew & White, LLC
1122 Central Ave SW, Ste. 1
Albuquerque, NM 87102

Angela Swenson
Attorney for New Mexico Taxation and Revenue Department
New Mexico Attorney General Office
201 Third St NW, Suite 300
Albuquerque, NM 87102

Michael K Daniels
Attorney for Debtor
PO Box 1640
Albuquerque, NM 87103-1640